# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROGER BUEHL, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 10-02288 |
| | ) | |
| | ) | Judge James M. Munley |
| v. | ) | |
| | ) | *Electronically Filed* |
| JON D. FISHER, | ) | |
| SUPERINTENDENT; | ) | |
| PAUL K. SMEAL, FORMER | ) | |
| SUPERINTENDENT; | ) | |
| LISA HOLLIBAUGH, | ) | |
| SUPERINTENDENT'S ASST.; | ) | |
| DANIEL MYERS, INTEL. | ) | |
| CAPTAIN; | ) | |
| RODNEY PAINTER, LT.; | ) | Jury Trial demanded |
| KEVIN SMITH, | ) | |
| CORR. OFFICER; | ) | |
| DONALD SULLIVAN, CORR. | ) | |
| OFFICER; | ) | |
| DORINA VARNER, CHIEF | ) | |
| GRIEVANCE OFFICER; | ) | |
| CHARLES MITCHELL, | ) | |
| HEARING EXAMINER; | ) | |
| R.SUSAN HANNAH, DEPUTY | ) | |
| SUPT. FOR FACILITY | ) | |
| MANAGEMENT; TODD | ) | |
| ROBINSON, MAJOR; AND | ) | |
| JOSEPH EICHENLAUB, | ) | |
| LIEUTENANT | ) | |
| | ) | |
| Defendants, | ) | |
| in their individual and | ) | |
| official capacities | ) | |

1

## AMENDED AND SUPPLEMENTAL COMPLAINT

### I.   INTRODUCTION

1.   The Plaintiff, Roger Buehl, a prisoner currently incarcerated at SCI-Mahanoy, brings this civil rights action under 42 U.S.C. § 1983, asserting retaliation claims under the First Amendment and due process claims under the Fourteenth Amendment.

### II.   JURISDICTION AND VENUE

2.   This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.   Venue is proper under 28 U.S.C. § 1391(b), as all of the causes of action upon which the complaint is based arose in Huntingdon or Cumberland Counties, Pennsylvania, which are in the Middle District of Pennsylvania.

### III.   PARTIES

4.   Plaintiff, Roger Buehl, is a citizen of the United States of America and is incarcerated at SCI-Mahanoy.  For most of the time period during which the events underlying this complaint occurred, Plaintiff was incarcerated at SCI-Smithfield, which is located in Huntingdon, Pennsylvania.

5.   Defendants Superintendent Jon D. Fisher, former Superintendent Paul K. Smeal, Superintendent's Assistant Lisa Hollibaugh, Intelligence Captain Daniel Myers, Lieutenant Rodney Painter, Correctional Officer Kevin

Smith, Correctional Officer Donald Sullivan, DOC Chief Grievance Officer Dorina Varner, Deputy Superintendent R. Susan Hannah, Major Todd Robinson, Lieutenant Joseph Eichenlaub, and Hearing Examiner Charles Mitchell were at all times relevant hereto employees of the DOC and were acting under color of state law.

6.     At all times relevant to this complaint, Defendant Paul K. Smeal was the Superintendent at SCI-Smithfield, a DOC institution located in Huntingdon, Pennsylvania.

7.     As the Superintendent of SCI-Smithfield, Defendant Smeal exercised supervisory authority over all other DOC officials and staff within the institution, including Defendants Hollibaugh, Myers, Painter, Eichenlaub, Smith, Sullivan, Hannah, Robinson, and Mitchell.

8.     Defendant Smeal was replaced by Defendant Jon D. Fisher as Superintendent in or around December 2009.  Defendant Fisher's duties and responsibilities as Superintendent are the same as Defendant Smeal's, as described above.

9.     At all times relevant to this complaint, Defendant Hollibaugh was the Superintendent's Assistant and Facility Grievance Coordinator at SCI-Smithfield.  As such, Defendant Hollibaugh has worked closely with

Defendants Smeal and Fisher, has handled institutional legal issues, and has administered the Inmate Grievance System at the institutional level.

10. At all times relevant to this complaint, Defendant Daniel Myers was the Intelligence Captain at SCI-Smithfield responsible for daily operation and management of the institutional security office.

11. Defendant Myers reported to, and implemented orders by, Defendants Smeal, Fisher, Hannah, and Robinson.

12. Defendant Myers supervised Defendants Painter, Eichenlaub, Smith, and Sullivan, all of whom were posted to the security office.

13. At all times relevant to this complaint, Defendant Painter was either a Correctional Lieutenant or a Correctional Captain, whose responsibilities included supervision of Defendants Smith and Sullivan.

14. As a Lieutenant, Defendant Painter reported to, and implemented orders by, Defendant Myers, who was his direct supervisor, and by Defendants Smeal, Fisher, Hannah, and Robinson.

15. At all times relevant to this complaint, Defendants Smith and Sullivan were Correctional Officers assigned to the SCI-Smithfield security office.

16. Defendants Smith and Sullivan reported to and implemented orders by Defendants Myers and Painter, Smeal.

17.   At all times relevant to this complaint, Defendant Varner was the Chief

Grievance Officer for the DOC.

18.   In her capacity as Chief Grievance Officer, Defendant Varner issued "Final

Appeal Decisions" in response to a number of Plaintiff's grievance appeals

relating to yard and indoor exercise practices at SCI-Smithfield.

19.   Defendant R. Susan Hannah was the Deputy Superintendent for Facility

Management at all times relevant to this complaint and was responsible for

the supervision and management of daily institutional operations, including

the security office, yard, and prisoner activities.

20.   Defendant Todd Robinson was the Major of the Guard at all times relevant

to this complaint.  In that position, Defendant Robinson is the highest

ranking correctional officer at SCI-Smithfield.

21.   As a Major, Defendant Robinson supervises all Captains, including Security

Captains and Shift Commanders, and all lower ranks of Correctional

Officers at SCI-Smithfield.

22.Defendant Robinson is directly responsible for supervising and managing

daily institutional operations, including the operations of the security office,

yard, and prisoner activities.

23. As the highest ranking Correctional Officer, Defendant Robinson has policy making and decision making authority on a wide variety of issues, including those related to prisoner activities.

24. Defendant Robinson reported to Defendants Smeal, Fisher, and Hannah.

25. Defendant Joseph Eichenlaub, at all times relevant to this complaint, was a Security Lieutenant at SCI-Smithfield.  In that position, Defendant Eichenlaub worked with other staff in the Security Office, including Defendants Myers, Painter, Smith, and Sullivan.

26. Defendant Eichenlaub's duties include ordering cell searches and conducting interviews.

27. Prior to becoming a Security Lieutenant, Defendant Eichenlaub worked as a search team officer in the Security Office.

28. At all times relevant to this complaint, Defendant Charles Mitchell was a Hearing Examiner at SCI-Smithfield and was responsible for holding hearings on misconduct charges levied against prisoners at SCI-Smithfield.

29. All Defendants are sued in their individual and official capacities.

## IV.   **FACTS**

30. Pennsylvania law mandates that prisoners housed in general population in a state correctional institution be provided with at least two (2) hours of physical exercise outdoors on a daily basis, weather permitting.  See 61 Pa.

C.S. § 5901(a).  Section 5901 also mandates that such prisoners be provided with at least two (2) hours of physical exercise indoors, not within the confines of their cells, when outdoor exercise is cancelled due to weather conditions.

31.  Soon after Plaintiff was transferred to SCI-Smithfield in 2007, he observed that outdoor exercise (known as "yard") for general population prisoners was frequently cancelled, curtailed, or delayed by prison staff.

32.  When Plaintiff inquired about the cancellations, delays, and early terminations of yard, SCI-Smithfield officials and staff told him that they were due to "inclement weather."

33.  However, Plaintiff observed that many yard cancellations, delays, and early endings of yard occurred when weather conditions were not "inclement" by any common or rational definition.

34.  Plaintiff also observed that general population prisoners were not provided with two hours of indoor non-cell exercise on days when outdoor yard was cancelled.

35.  Since 2007, Plaintiff has submitted numerous requests to staff, grievances, and grievance appeals regarding the SCI-Smithfield practices of shortening or canceling scheduled yard periods and refusing to provide indoor exercise when yard is cancelled.

36. Plaintiff's requests, grievances, and appeals were reviewed and addressed by Defendants Smeal, Fisher, Hollibaugh, and Varner, who summarily upheld SCI-Smithfield yard/ exercise practices, and invariably affirmed the staff determinations that "inclement weather" warranted cancellation or shortening of yard periods.

37. Plaintiff's grievance documents were also distributed to and reviewed by Defendant Robinson.

38. Defendants refused to change the yard cancellation practices or to investigate the validity of the "inclement weather" determinations.

39. Plaintiff submitted written requests and appeals to the DOC, pursuant to Pennsylvania's Right-to-Know Act (RTKA), 65 P.S. §§ 66.1, et seq., seeking access to the DOC and SCI-Smithfield definitions of "inclement weather."

40. The DOC denied Plaintiff's requests, asserting that the release of the definition of "inclement weather" constituted a "personal security exception" under the RTKA.

41. In January 2008, Plaintiff appealed for judicial review of the DOC's denial of his RTKA request, and on August 14, 2008 the Commonwealth Court held that the claimed security concerns were speculative and were outweighed by

the public interest in access to the "inclement weather" definition. <u>See</u>
<u>Buehl v. DOC</u>, 955 A.2d 488, 494 (Pa. Commw. Ct. 2008).

42. Pursuant to the Commonwealth Court's order, the DOC provided Plaintiff
    with two policy documents containing "inclement weather" definitions:
    Policy 6.3.1-SMI and a memorandum dated February 26, 1998 from former
    DOC Secretary Jeffrey Beard setting forth "Guidelines for Cancellation of
    Yard."

43. Thereafter, Plaintiff observed that SCI-Smithfield staff continued to cancel
    yard in reliance on the "inclement weather" rationale, even when the actual
    weather conditions were not "inclement," as defined by both policy
    documents he had received.

44. Plaintiff subsequently filed additional grievances and appeals claiming that
    SCI-Smithfield yard/ exercise practices violated constitutional rights, state
    statutory mandates and both DOC and SCI-Smithfield policies.  None of
    these grievances/ appeals succeeded in facilitating any changes to SCI-
    Smithfield yard / exercise practices.

45. On August 19, 2009 Plaintiff filed a mandamus action in the Commonwealth
    Court of Pennsylvania, naming as respondents the PA DOC, Jeffrey Beard,
    and Paul Smeal, and seeking an order requiring that these respondents follow

the state statutory mandates of 61 Pa. C.S. § 5901, to correct SCI-Smithfield

yard/ exercise practices.  See <u>Buehl v. DOC, et al.</u>, No 435 MD 2009.

46.  The mandamus petition was served on Defendant Smeal, at SCI-Smithfield,

on August 24, 2009.

47.  Since 2007 and continuing to the present, Plaintiff's requests, grievances, and

grievance appeals, including those regarding the denial of outdoor and

indoor exercise, have been well known to many inmates and staff at SCI-

Smithfield, including all Defendants, by virtue of, among other things, their

positions, duties, and responsibilities.

48.  It is common practice for Correctional Officers and other institutional staff to

be notified about grievances which relate to their posts, duties, or areas of

responsibility.

49.  Plaintiff's 2008 RTKA appeal to the Commonwealth Court, in which he

sought the definition of "inclement weather," was, <u>and is</u>, well known to

many staff at SCI-Smithfield, including Defendants, by virtue of, among

other things, their positions, duties, and responsibilities.

50.  The Commonwealth Court decision requiring DOC to disclose the

"inclement weather" definition to Plaintiff was widely reported by the

media, and numerous SCI-Smithfield staff and prisoners questioned Plaintiff

about the court decision.

51.   Plaintiff's August 2009 mandamus petition and the continuing litigation of
      that case in state court, was, and is, well known to many staff at SCI-
      Smithfield, including Defendants, by virtue of, among other things, their
      positions, duties, and responsibilities.

52.   Defendants Fisher, Hollibaugh, Myers, Painter, Smith, Sullivan, Mitchell,
      Hannah, Robinson, and Eichenlaub know about Plaintiff's instant federal
      action, either due to their status as Defendants in this action or by virtue of
      their duties, responsibilities, and communications with the Defendants in this
      action.

53.   Investigative searches within the DOC are conducted for various purposes,
      including deterrence and discovery of specified information or items.

54.   Unlike random or general searches, investigative searches of prisoners or
      their cells are directed at a particular prisoner, area, or objective.

55.   Investigative searches require the prior approval of the Security Office
      Lieutenant, the Intelligence Captain or another officer of equal or higher
      rank, including the Major, the Deputy Superintendent, and the
      Superintendent.

56.   Defendants Smith and Sullivan were frequently assigned as a team to conduct
      investigative searches of prisoners' cells.

57.   The investigative searches conducted by Defendants Smith and Sullivan were substantially longer in duration, more intense, and more exhaustive than investigative searches conducted by other search teams at SCI-Smithfield.

58.   Investigative searches by Defendants Smith and Sullivan were well known at SCI-Smithfield for being particularly harassing and intimidating.

59.   On August 28, 2009, nine days after Plaintiff filed the mandamus petition in state court and four days after Defendant Smeal was served with a copy of the petition, Defendants Smith and Sullivan conducted a four-hour investigative search of Plaintiff's cell at SCI-Smithfield.

60.   When Plaintiff asked Defendants Smith and Sullivan the reason for the cell search, they did not respond.

61.   During the search, Defendants Smith and Sullivan combed through Plaintiff's legal materials, including those pertaining to the mandamus petition, reading each document thoroughly before moving on to the next.

62.   During past cell searches, Plaintiff's legal materials were scanned, but not read, by the officers conducting the search.

63.   Defendants Smith and Sullivan confiscated 30 items from Plaintiff's cell following the search and issued three "Confiscated Items Receipts" to Plaintiff, which listed the items that were confiscated.

64.  Among the confiscated items were Plaintiff's television antenna, desk lamp, document folders, address book, Scrabble dictionary, and an accounts notebook.

65.  There was no legitimate reason for either the investigative search or the confiscation of these items.

66.  On the confiscated items receipts, Defendants Smith and Sullivan inserted the word "altered" next to each of these six items.

67.  Four of these purportedly "altered" items (the Scrabble dictionary, address book, desk lamp, and accounts notebook) had been in Plaintiff's possession, in his cell, and in the same physical state as on the date of their confiscation, since his transfer from SCI-Albion to SCI-Smithfield in 2007.

68.  Defendants later informed Plaintiff that the Scrabble dictionary, address book, document folders, and accounts notebook were considered "altered" because Plaintiff had applied clear packaging tape to their covers in order to prolong their usefulness and life.

69.  The application of tape to these items did not alter their design, function, or purpose.

70.  Plaintiff had applied the packaging tape to these items at his previous institution, SCI-Albion, where such tape was made available to prisoners in

the library.  Additionally, such tape was available to SCI-Smithfield
prisoners until mid-2009.

71.   Other inmates at SCI-Smithfield have been permitted to retain property on
which packaging tape had been applied in the same manner.

72.   During previous cell searches, including investigative searches, none of these
purportedly "altered" items had been cited as problematic, nor had Plaintiff
been given any warnings about problems with these items.  Plaintiff was not
issued a misconduct in connection with the August 28, 2009 investigative
search.

73.   After Plaintiff filed a grievance regarding the confiscation of his property,
Defendant Painter spoke with him and stated that, at the conclusion of the
grievance process, Plaintiff would be permitted to remove the tape from the
confiscated items, after which they could be returned to his possession.

74.   The permission (to remove tape) granted by Defendant Painter was later
disregarded by Defendant Smith who forced Plaintiff to choose between
destroying or shipping the confiscated items.

75.   Plaintiff's grievance about the cell search and property confiscation was
denied by Defendant Painter and summarily affirmed by Defendants Smeal
and Varner.

76.   The August 28, 2009 investigative search of Plaintiff's cell and confiscation of property were ordered and/ or approved by Defendants Smeal, Myers, and Painter.

77.   Defendants Smeal, Myers, and Painter directed Defendants Smith, and Sullivan to conduct the investigative search with the full knowledge that these officers would spend many hours combing through Plaintiff's property, reading his personal and legal documents, and applying prison rules (such as the prohibition of possessing "altered" items) in a hyper-technical manner.

78.   Defendants ordered and conducted this search in order to retaliate against Plaintiff for filing grievances and the state court lawsuits.

79.   During his incarceration in the DOC system, Plaintiff has regularly sought and received, via U.S. mail, publicly available court docket reports for both active and closed cases in federal and state court.

80.   In April 2008, officials at SCI-Smithfield confiscated several docket reports which had been sent to Plaintiff through the mail.

81.   When Plaintiff grieved this confiscation, prison officials, including Defendant Smeal, responded that the docket reports were prohibited, as "contraband," under DOC policy DC-ADM 003 because they contained "information pertaining to another inmate."

82.   Plaintiff appealed this decision to the Secretary's Office of Inmate Grievances and Appeals, arguing that the docket reports were not "contraband" simply because they dealt with other inmates' cases.  To the contrary, the docket reports reflected judicial action and were available to the public through the clerks of court and under Pennsylvania's Right to Know Law.

83.   On June 30, 2008, former DOC Chief Grievance Officer Cindy Watson reversed the decision from SCI-Smithfield, stating in her Final Appeal Decision that "court docket entries do not qualify as information regarding another inmate as that term is intended in DC-ADM 003."

84.   After the June 30, 2008 Final Appeal Decision, Plaintiff was permitted to receive and possess docket reports at SCI-Smithfield.

85.   From June 30, 2008 until approximately September 18, 2009, Plaintiff was not confronted by any SCI-Smithfield staff about his receipt or possession of court docket reports, which he received through the mail during this time frame.

86.   On or about September 18, 2009, less than one month after Plaintiff filed the mandamus petition in Commonwealth Court, Defendant Painter had Plaintiff called to central control.

87. When Plaintiff arrived, Defendant Painter displayed two pieces of incoming mail addressed to Plaintiff and demanded an explanation for the court docket reports contained in the mail.

88. When Plaintiff declined to explain, Defendant Painter told Plaintiff that he had confiscated this mail within the previous ten days, because it contained the docket reports.

89. Defendant Painter told Plaintiff that the docket report confiscation had been approved by Defendant Hollibaugh, in consultation with Defendant Varner and DOC Chief Counsel.

90. The docket reports confiscated in September 2009 differed in no material respect from the docket reports at issue in April 2008.

91. On or about September 18, 2009, Plaintiff submitted a request to staff to Defendant Hollibaugh, asking her to look into the matter and informing her that the issue of court docket reports had been resolved in his favor in June 2008 by the Chief Grievance Officer in consultation with DOC Chief Counsel.

92. Defendant Hollibaugh responded by asserting the same rationale previously rejected in June 2008 by the Chief Grievance Officer, namely: "the presence of information related to another inmate is considered contraband, even though it may be public information. . ."

93.   Plaintiff's grievance and grievance appeal about the docket report
       confiscation were addressed and denied by Defendants Myers and Smeal.

94.   Plaintiff then appealed to Defendant Varner, in the Secretary's Office of
       Inmate Grievances and Appeals, pointing out that the June 30, 2008 decision
       on the same issue had been resolved in Plaintiff's favor.

95.   When Defendants Hollibaugh, Painter, Myers and Smeal confiscated (or
       ordered the confiscation of) Plaintiff's docket reports in September 2009, the
       Final Appeal Decision dated June 30, 2008 which permitted Plaintiff to
       possess such docket reports was in effect and was undisturbed by any
       contrary decision.

96.   Defendant Varner issued a Final Appeal Decision upholding Defendants
       Myers and Smeal's responses and directly contradicting the April 2008
       decision on the same issue.

97.   Plaintiff's receipt and possession of the court docket reports had caused no
       disturbances or other problems at SCI-Smithfield and, indeed, Defendants'
       responses to Plaintiff's requests and grievances did not identify any
       problems.

98.   Defendants Hollibaugh, Smeal, Myers, and Painter confiscated (or ordered
       the confiscation of) Plaintiff's docket reports and conspired with Defendant

18

Varner to override (and overrode) the June 30, 2008 Final Appeal Decision for no legitimate reason.

99.  Defendants Hollibaugh, Smeal, Myers, and / or Painter engineered a reversal of the June 30, 2008 decision, in collusion with Defendant Varner, so that the docket report confiscation would be retroactively justified at the highest level of the DOC grievance system.

100.  Defendants engaged in this course of action in order to retaliate against Plaintiff for his grievances and litigation activities.

101.  Defendants' secret interception and confiscation of Plaintiff's incoming mail, without providing Plaintiff notice, and the interrogation of Plaintiff about the content of his mail caused Plaintiff to feel intimidated and oppressed; created a chilling effect which heightened Plaintiff's concerns about scrutiny and censorship of his mail; discouraged Plaintiff from free, open communications via mail; and deprived Plaintiff of his right under state law to access public court records.

102.  Defendants' arbitrary reversal of DOC policy caused Plaintiff to feel intimidated; deprived Plaintiff of his right under state law to access public court records; and undermined Plaintiff's reliance on the finality of DOC final review decisions.

103.  In December 2010, the DOC's preliminary objections were overruled

19

in the state court mandamus action, and the DOC was ordered to respond to the allegations in the mandamus petition.

104.    After this development in the state court lawsuit, SCI-Smithfield began changing its practices with regard to outdoor exercise.

105.    In late March 2011, Defendants Fisher, Hannah, and Robinson implemented and approved orders directing Shift Commanders to open the yard even in rainy weather conditions and directing that officers assigned to yard duty be required to take their posts in the yard, in rain gear, if necessary, despite the rainy conditions.

106.    This new practice of opening yard during all weather conditions is a sharp departure from SCI-Smithfield's previous practices, which were in place for many years.

107.    On information and belief, Defendants Fisher, Hannah, and Robinson informed their subordinates (including Shift Commanders and prison staff) that the changes in yard policy were being implemented, in large part, due to prisoner grievances and lawsuits, including Plaintiff's.

108.    After this new policy was put into place, prison staff complained and blamed Plaintiff's grievance and litigation activity for the change.

109.    Staff also took aggressive actions towards Plaintiff, such as attempting to block his path while he ran on the "runner's lane" in yard.

110.    Yard staff took vindictive action against other inmates as well, such as forcing inmates who were in the covered weight pavilion out into the rain because they were not constantly working out.

111.    These actions, directed towards Plaintiff and towards other prisoners, intimidated Plaintiff and created a chilling effect on grievance activity by Plaintiff and other prisoners.

112.    When yard first began to be offered despite rainy weather, inmates had the choice of going out to yard or staying inside the institution spending that time on the block, rather than in their cells.  This is known as "block out."

113.    At SCI-Smithfield, block out had historically been offered during scheduled evening yard times Monday through Friday, and during scheduled yard periods on Sundays and holidays.

114.    Defendants Fisher, Hannah, and Robinson authorized, approved, and /or implemented a March 23, 2011 policy change to the yard/ block out schedule for the upcoming season, such that if yard was offered to inmates, block out would not be offered.

115.    Consequently, if an inmate did not go outside for yard (due to disability, work, call-outs, weather, or other reasons), he would have to stay locked inside his cell.

116.    The new yard/ block out schedule also changed when and to whom various yard options were offered; including elimination of the small amphitheater yard for prisoners on the privilege wings and Special Needs Unit.

117.    The new schedule was effective April 4, 2011.

118.    After the new schedule took effect, inmates who complained about the changes were told by prison staff to "blame it on the inmate who filed the lawsuit," or words to that effect, meaning Plaintiff.

119.    Upon information and belief, Defendants Fisher, Hannah and Robinson eliminated block-out and closed amphitheater yards as a *quid pro quo* or concession to prison staff in exchange for the new orders requiring staff to open yard, and take their posts, in all weather conditions.

120.    Defendants Fisher, Hannah, and Robinson closed the amphitheater yards to penalize the prisoner population in retaliation for Plaintiff's grievances and litigation about outdoor and indoor exercise.

121.    Defendants' elimination of block out and closure of amphitheater yards represents a radical break from SCI-Smithfield's previous practices, which were in place for many years and was done in retaliation for Plaintiff's grievance and litigation activities.

122.    These actions, which had the effect of making both staff and prisoners

22

angry at Plaintiff for his grievance and litigation activities, intimidated Plaintiff and created a chilling effect on Plaintiff's grievance activity and on the prisoner population, generally.

123.    The March 23, 2011 yard/ block out schedule substantially increased the number of yard cancellations based on yard capacity (per the 600 Rule), particularly during weekend and evening yard periods.

124.    Many prisoners, including Plaintiff, were upset about the new yard/ block out schedule, as it directly impacted them and resulted in more time inside.

125.    When they complained to prison staff about the change, prisoners were told they should "blame it on the guy who is suing and complaining about yard," meaning Plaintiff.

126.    Plaintiff filed a grievance about the yard/ block out changes on March 29, 2011.

127.    After filing the grievance, Plaintiff was approached by other prisoners who wanted suggestions on how to word their own grievances, which they intended to file on their own.

128.    Plaintiff gave the prisoners who asked him for this assistance a print out of a modified version of his grievance ("draft text"), which had been retained in his electric typewriter's memory.

129.     Plaintiff's interaction with the other prisoners regarding this draft text

ended at the point he gave them the print out -- he did not file the grievances

on their behalf, did not ask them to file a grievance, and did not ask them to

sign anything.

130.     Plaintiff did not tell the inmates that they had to use the draft text "as-

is;" he told them to use, not use, or modify it, as they saw fit.

131.     The draft text was clearly intended for use in official channels; i.e.,

the DOC grievance process, and in no way encouraged or suggested that

prisoners circulate or sign a petition, disrupt institutional activities or violate

any policy or rule.

132.     On or about April 4, 2011, Defendant Smith conducted a search of

inmate Thomas Wisniewski, a library legal aide, as he was returning to

work.  Wisniewski had a copy of the draft text in his possession, and

Defendant Smith read it, asked about it, and commented that it "looked like

something inmate Buehl would write."

133.     Upon information and belief, Defendant Smith informed Defendants

Myers, Eichenlaub, and other members of the Security staff about the draft

text.

134.     Later that day, the draft text Plaintiff had given to inmate Thomas

Wisniewski was confiscated by a staff library worker while Wisniewski was

away from the library.

135.     Upon information and belief, the draft text was soon forwarded to

Defendants Myers, Eichenlaub, and other Security Staff for review.

136.     During the first week of April 2011, numerous prisoners filed

grievances with wording identical to the draft text.  Each person's grievance

was individually written, signed, and submitted, in accordance with the

requirements of the DOC grievance policy.

137.     Defendant Hollibaugh reviewed each grievance and assigned an

official tracking number to each.  Defendant Robinson was the designated

"grievance officer" assigned to respond to these grievances.

138.     Defendants Fisher, Hollibaugh, Hannah, and/ or Robinson requested,

ordered or approved an investigation into the grievances to be done by

Defendants Myers and Eichenlaub.

139.     On April 6, 2011, when Plaintiff was returning from afternoon yard,

two officers from the Security Office pulled him aside and subjected him to

a body search.

140.     These officers then proceeded to Plaintiff's cell, confiscated his

typewriter and removed it from his cell.  They asked Plaintiff for the

typewriter manual so they could access the memory feature.  Plaintiff

showed them where the manual was.

141.     These officers conducted an extensive investigative search of

Plaintiff's cell, telling him that they were told to find and confiscate any

documents related to Plaintiff's exercise lawsuit or his grievances about yard

and block out.

142.     The officers slowly and thoroughly read Plaintiff's legal materials,

including the confidential legal mail between Plaintiff and his counsel.

143.     The officers also confiscated other personal and legal property from

Plaintiff, including: "1 four-page questionnaire from PA Institutional Law

Projects; 1 page legal work; 1 grievance form letter; 1 yellow sheet of paper;

1 Homemade telephone / address book."

144.     The four-page questionnaire ("attorney questionnaire") confiscated

from Plaintiff's cell was clearly prepared on a computer and intended for use

in collecting information for counsel's litigation of the state court mandamus

action.

145.     The attorney questionnaire in no way encouraged or suggested that

prisoners circulate or sign a petition, disrupt institutional activities, or violate

any policy or rule.

146.     Defendants Myers and Eichenlaub ordered, directed, and / or

approved the April 6, 2011 investigative search and property confiscation, as

described above.

147.     Later that day, several officers came to Plaintiff's cell, handcuffed

him, and took him to the Restricted Housing Unit (RHU), also known among

inmates as "the hole."

148.     Plaintiff was given an "other" report stating that he was being placed

in Administrative Custody (AC status) because he had "been charged with or

is under investigation for violation of institution rules ..."

149.     Defendant Eichenlaub prepared the "other" report and Defendant

Painter reviewed and approved it and approved Plaintiff's placement in the

RHU.

150.     Defendant Myers ordered, directed, and / or approved Defendant

Eichenlaub's preparation of the "other" report and Plaintiff's placement in

the RHU.

151.     As the Facility Manager, Defendant Fisher reviewed and approved

Plaintiff's placement in the RHU in AC status.

152.     On or about April 11, 2011, Plaintiff received a misconduct report

charging him with:  engaging in or encouraging unauthorized group activity;

possession or circulation of a petition; and possession of contraband.

153.     The misconduct charges were based, in part, on the fact that numerous

inmates had filed grievances about the yard/ block out changes with identical

language and that language was the same as the draft grievance text found in

Plaintiff's typewriter memory.

154.     The misconduct charges were also based on Plaintiff's possession of the draft text described above.  The misconduct report mischaracterizes the draft text as a "form letter" even though it lacked an addressee, salutation, and signature line.

155.     Plaintiff violated no rules by any of his actions.

156.     There is no prohibition in DOC policy against inmates submitting grievances on the same subject.

157.     There is no prohibition in DOC policy against inmates assisting other inmates in drafting grievances.

158.     There is no prohibition in DOC policy against inmates submitting grievances with similar or identical language.

159.     There is no prohibition within the DOC against inmates talking to each other about issues that affect them all.

160.     Under DOC policy, a "petition" is "a document signed by two or more persons requesting or demanding that something happen or not happen, without the authorization of the Superintendent."

161.     The draft text prepared by Plaintiff does not fall within this definition.

162.     The misconduct charges were also based on Plaintiff's possession of a copy of the attorney questionnaire.  The misconduct report falsely states that

the questionnaire pertains to the March 23, 2011 yard/ block out policy change.

163.     The attorney questionnaire was prepared by Plaintiff's counsel in 2009 when she began the investigative phase of the state court mandamus litigation.  It is four pages double-sided, and is related to SCI-Smithfield exercise practices.

164.     Beginning in 2009, Plaintiff's counsel mailed blank copies of the questionnaire to Plaintiff and other SCI-Smithfield prisoners who had expressed an interest in providing information.  Counsel instructed each recipient to complete the questionnaire and return it to her, as it was for her use only.  The questionnaire itself contains the same instruction.

165.     Defendants Myers and Painter authorized or directed Defendant Eichenlaub to prepare the misconduct report.

166.     In preparing the misconduct report, Defendant Eichenlaub deliberately mischaracterized the draft text and the attorney questionnaire to support baseless misconduct charges against Plaintiff.

167.     Defendants Myers and Painter knew that the charges were unfounded.

168.     Defendants Myers, Painter, and Eichenlaub abused their authority as Security Officers and deliberately misused the DOC disciplinary procedures in retaliation against Plaintiff for his speech, grievance, and litigation

activities and to obstruct and penalize those activities.

169.    Plaintiff's misconduct hearing was originally set for April 13, 2011,

and on the morning of that date, Plaintiff was ordered to "get ready" for the

hearing.

170.    Plaintiff was later informed that his misconduct hearing would be

delayed because Defendant Mitchell wanted to speak and confer with

Defendant Eichenlaub about the misconduct report before the hearing.

171.    Upon information and belief, prior to Plaintiff's misconduct hearing,

Defendants Robinson, Hannah, Myers and/ or Eichenlaub, conferred with

each other and with Defendant Mitchell for the purpose of subverting the

disciplinary process to contrive a "finding" that the draft text and attorney

questionnaire were petitions and, therefore, "contraband."

172.    Defendant Mitchell commenced Plaintiff's misconduct hearing on

April 18, 2011.

173.    Plaintiff submitted his "Inmate Version" sheet and pleaded not guilty

to all three misconduct charges.

174.    Plaintiff requested three witnesses for his hearing, to provide

documentary and testimonial evidence, but Defendant Mitchell denied this.

175.    One of the three requested witnesses was Defendant Eichenlaub.

Because this witness was denied, Plaintiff was not able to question

Defendant Eichenlaub about any evidence (including the draft text or attorney questionnaire) or information that either Eichenlaub or other prison staff had shared with Defendant Mitchell before the hearing or about Defendant Eichenlaub's misconduct allegations as to the draft text or attorney questionnaire.

176.     Neither the draft text nor the attorney questionnaire were presented as evidence during the misconduct hearing and Plaintiff had no opportunity to review these documents, which formed the basis for the charges against him.

177.     The evidence and testimony Plaintiff sought to present would have demonstrated that the charges were not supported.

178.     Defendant Mitchell denied Plaintiff the opportunity to present a meaningful defense to the charges.

179.     Defendant Mitchell found Plaintiff guilty of all three misconduct charges and sanctioned Plaintiff to 90 days' disciplinary custody in the RHU.  Defendant Mitchell also ordered that Plaintiff's typewriter and the documents confiscated from his cell on April 6, 2011 be "revoked" as "contraband."

180.     Defendant Mitchell knowingly ignored or overrode the DOC misconduct procedures and disciplinary charge definitions in order to adjudicate Plaintiff guilty of all misconduct charges by "finding" that the

draft text and identical grievances constituted "a petition" and were, therefore, "contraband."

181.    There was no evidence to support Defendant Mitchell's "guilty" findings for the misconduct charges against Plaintiff.

182.    Defendant Mitchell was biased and partial both before and during Plaintiff's misconduct hearing.

183.    Defendant Mitchell colluded with Defendants Robinson, Myers, and Eichenlaub, and Hannah in adjudicating Plaintiff guilty of the misconduct charges in retaliation for Plaintiff's speech, grievance, and litigation activities, and in order to obstruct and penalize those activities.

184.    Plaintiff appealed to the Program Review Committee (PRC), which is the next level in the misconduct proceedings appeal process.

185.    The PRC sustained Defendant Mitchell's decision, ignoring Plaintiff's arguments and engaging in additional (and unauthorized) fact-finding that the attorney questionnaire was also "contraband."

186.    After Plaintiff was found guilty of the charges, Defendants Hollibaugh, Robinson, Myers, and Eichenlaub orchestrated a campaign of intimidation and harassment directed towards prisoners who had filed grievances about yard and block out based on the draft text.

187.    These prisoners were called to Security and told they could either

withdraw their grievances or be put into the RHU ("the hole").

188.   On information and belief, each inmate chose to withdraw his grievance instead of being put in the hole.

189.   Defendants also conducted searches (or ordered that such searches be conducted) in prisoners' cells for the attorney questionnaire, which was seized as "contraband" if found.

190.   These actions created a chilling effect throughout the prisoner population and were done to retaliate against Plaintiff and to punish him and other prisoners for Plaintiff's grievance and litigation activities.

191.   On information and belief, Defendants' intimidation of and retaliation against SCI-Smithfield prisoners, based on the incidents described in this complaint, continues to this day.

192.   Plaintiff appealed the PRC's decision to Defendant Fisher, who summarily upheld the decisions of the PRC and Defendant Mitchell, without any consideration of the issues raised by Plaintiff.

193.   Defendant Fisher sustained the misconduct findings and sanctions in retaliation for and in punishment of Plaintiff's speech, grievance and litigation activities.

194.   Defendant Fisher's appeal response, dated May 5, 2011, was not delivered to Plaintiff until May 16, 2011.

195.     After receiving this response, Plaintiff appealed to the DOC's Chief

Hearing Examiner. Plaintiff's final review appeal was received by the DOC

Chief Hearing Examiner on May 23, 2011 via fax and on May 25, 2011 via

certified mail.

196.     Throughout the entire misconduct appeals process, Plaintiff remained

in the hole.

197.     After four weeks (on June 27, 2011), Plaintiff received notification

from the DOC's Acting Deputy Secretary, John Murray, informing him that

the Chief Hearing Examiner had recommended that the case  be remanded to

the institution for a new hearing and that the Acting Deputy Secretary

concurred in this recommendation.

198.     On June 29, 2011, the Hearing Clerk scheduled the misconduct

charges for rehearing.

199.     On June 30, 2011, Plaintiff was given an "other" report stating that he

was released from disciplinary custody status and placed in administrative

custody status (still housed in the RHU) because "he is a danger to himself

or others."

200.     On July 6, 2011, a second "disciplinary hearing report" was issued on

the April 11, 2011 charges levied against Plaintiff and the report was

delivered to Plaintiff at his RHU cell.

201.    Although the report purports to be a record of a disciplinary hearing, no hearing was actually held.

202.    All charges against Plaintiff were dismissed.

203.    Despite the dismissal of all the charges, Plaintiff remained housed in the RHU and was not released to general population.

204.    Plaintiff had a hearing before the Program Review Committee on July 7, 2011 regarding his continued detention in the RHU.

205.    Defendant Hannah was present at this hearing.

206.    During the hearing Plaintiff was informed that he would remain on AC status, in the RHU, pending a separation transfer, based on a separation between Plaintiff and inmate Wisniewski.

207.    On information and belief, Defendants Myers and Eichenlaub participated in the decision to impose the separation and implement the separation transfer.

208.    Plaintiff objected and said that there was no basis for such a separation; however, Defendant Hannah disregarded this objection.

209.    Plaintiff asked the PRC for AC status privileges, but Defendant Hannah denied this, stating that he was "not eligible yet."

210.    Defendant Fisher sustained Defendant Hannah's decisions to continue Plaintiff in AC status without privileges, and to carry out a "separation

transfer."

211. There was no legitimate reason for Plaintiff's continuation on AC status in the RHU without privileges, for Plaintiff's separation from inmate Wisniewski, or for Plaintiff to be transferred to another institution.

212. Defendants Hannah, Fisher, Myers and Eichenlaub took these actions in order to retaliation against Plaintiff and to penalize him for his speech, grievance, and litigation activities.

213. Plaintiff remained in the RHU at SCI-Smithfield, without privileges or access to his property, from April 6, 2011 to August 9, 2011, when he was transferred to SCI-Mahanoy.

214. After his transfer to SCI-Mahanoy, prison officials continued his AC placement in the RHU based on reviews, reports, and/ or other documents prepared or approved by Defendants.

215. Plaintiff's transfer to SCI-Mahanoy prevents him from benefiting from any improvements in SCI-Smithfield's yard/ exercise practices brought about by his speech, grievance, and litigation activities and subjects him to yard cancellation practices similar to those at SCI-Smithfield prior to March 2011.

216. Defendants Hannah, Fisher, Myers and Eichenlaub transferred Plaintiff to SCI-Mahanoy in retaliation for his grievance and litigation activities.

217. As a result of Plaintiff's April 6, 2011 placement in the RHU and his subsequent confinement there:

    a.  Plaintiff was forced to surrender possession of a significant amount of his personal property, which fit within the DOC's property limits but was nevertheless deemed "excess" during a property inventory by RHU staff;

    b.  Plaintiff was denied access to legal materials necessary for this case and for Plaintiff's state court case, which were unjustifiably deemed "excess" during a property inventory by RHU staff;

    c.  Plaintiff lost his approval for two boxes of legal materials to be in his possession;

    d.  Plaintiff lost his custody level, housing status, and housing assignment;

    e.  Plaintiff lost his institutional library job, pay scale, and wages he would have earned;

    f.  Plaintiff was set back in becoming eligible for promotional transfer;

    g.  Plaintiff was unable to purchase any of the summer package items or bake sale items;

    h.  Plaintiff lost extra blanket approval, which had been ordered in his medical records;

    i.  Plaintiff lost needed medications because there are only two pills lines in RHU, rather than four pill lines;

    j.  Plaintiff was subjected to an increased co-pay amount for medical care in the RHU.

218.  Plaintiff was subjected to isolating and punitive conditions in the RHU.

219.  Plaintiff's visits were severely restricted in the RHU, and he was permitted no radio, television, or phone calls.

220.  While in the RHU, Plaintiff's property was tampered with and destroyed while he was out of the cell; his medically approved "bottom bunk" status was eliminated for a period of time, exacerbating his back problems; he was forced to exercise in a cage and was only permitted one hour of such "exercise" five days per week.

221.  Plaintiff was deprived of showers and yard time by RHU staff.

222.  RHU staff limited Plaintiff's access to the RHU law library.

223.  RHU staff moved Plaintiff to the "grind up" wing where prisoners yell, scream, curse, kick doors and pound on furnishings all day/ night long, making sleeping difficult for Plaintiff and causing headaches.

224.  When carrying out these punitive actions, RHU staff made reference to Plaintiff's grievances and litigation about yard and exercise practices.

225.  Plaintiff's placement in the RHU ("the hole"), subjected to these conditions,

negatively impacted his physical and emotional wellbeing.

226. Plaintiff spent an unjustified 125 days in the RHU at SCI-Smithfield, because of Defendants' retaliatory conduct.

227. Plaintiff then spent an additional 14 days in the RHU at SCI-Mahanoy, after his transfer, due to reports and other documents placed in Plaintiff's file by Defendants.

228. In "AC" status in the RHU, Plaintiff was subjected to the same punitive conditions he experienced while in disciplinary custody status. Plaintiff's custody status changed in name only; the punitive conditions he was subjected to remained the same, as he was denied any AC privileges.

229. Defendants' continuation of Plaintiff's placement in the RHU in "AC" status constituted additional punishment inflicted on Plaintiff, for no legitimate reason.

230. Defendants Fisher and Hollibaugh continued to deny Plaintiff access to his legal materials, despite Plaintiff's grievances and requests for access and despite Plaintiff's need for these materials in connection with this case and the state court mandamus action.

231. Plaintiff continues to be deprived of his property, including his typewriter.

232. Plaintiff lost approximately twenty pounds during his time in the RHU and experienced physical pain and discomfort due to the extreme conditions

there.

233.   Plaintiff experienced mental and emotional suffering due to his lengthy unjustified detention in the RHU.

234.   Defendant Fisher reviewed and approved the misconduct proceedings and sanctions imposed on Plaintiff and reviewed and approved Plaintiff's AC status confinement.

235.   From the time Plaintiff was brought up on the unfounded misconduct charges to the time he was transferred to SCI-Mahanoy, Defendants were aware of the extreme, negative conditions and deprivations Plaintiff would be (and was) subjected to in the RHU.

236.   Defendants had no legitimate penological interests in penalizing Plaintiff's possession of either the draft text or the attorney questionnaire.

237.   The draft text, attorney questionnaire, and other prisoners' grievances about yard/ block out policy changes caused no prisoner disturbances, unrest, or disruption at SCI-Smithfield.

238.   Defendants had no legitimate penological interest in penalizing Plaintiff's communications with other prisoners concerning yard and block out practices and policies – issues which affected all prisoners.

239.   Plaintiff's communications with other prisoners caused no prisoner disturbances, unrest, or disruption at SCI-Smithfield.

240. Defendants launched a security office investigation, levied unfounded misconduct charges, and retaliated against and punished Plaintiff based on the content of the draft text and attorney questionnaire.

241. Defendants' conduct, as alleged above, caused Plaintiff severe mental, emotional, and physical suffering, including stress, anxiety, lethargy, fatigue, and depression, in addition to causing and exacerbating conflicts with cellmates.

242. Defendants' conduct violated Plaintiff's First and Fourteenth Amendment rights under the United States Constitution.

## V.   CAUSES OF ACTION

### Count I

First Amendment violation
Defendants Smeal, Myers, Painter, Smith and Sullivan

August 28, 2009 investigative cell search and confiscation of property

243. Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

244. Defendants Smeal, Myers, Painter, Smith and Sullivan's conduct in planning and carrying out the August 28, 2009, investigative search of Plaintiff's cell and confiscating Plaintiff's property, as alleged above in the "Facts" section, constitutes retaliation against Plaintiff for engaging in the protected activities

of filing requests to staff, grievances, the Right to Know Act appeal, and the

mandamus petition, in violation of Plaintiff's rights under the First and

Fourteenth Amendments to the United States Constitution.

245. As a result of this constitutional violation, Plaintiff suffered injuries and

damages as described above.

## Count II

First Amendment violation
Defendants Smeal, Myers, Painter, Hollibaugh, and Varner

Confiscation of court docket reports

246. Paragraphs 1 through 242 are incorporated herein by reference as though

fully set forth.

247. Defendants Smeal, Myers, Painter, Hollibaugh and Varner's conduct in

intercepting and confiscating Plaintiff's court docket reports and engineering

a reversal of the Final Appeal Decision permitting Plaintiff to possess the

reports, as alleged above in the "Facts" section, constitutes retaliation against

Plaintiff for engaging in the protected activities of filing requests to staff,

grievances, the Right to Know Act appeal, and the mandamus petition, in

violation of Plaintiff's rights under the First and Fourteenth Amendments to

the United States Constitution.

248. As a result of this constitutional violation, Plaintiff suffered injuries and

damages as described above.

## Count III

First Amendment violation
Defendants Fisher, Hannah, and Robinson

March 2011 yard and block out changes

249.     Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

250.     Defendants Fisher, Hannah, and Robinson's conduct in implementing changes in yard/ block out practices and in tying these changes to Plaintiff's grievance and litigation activities in order to engender anger against Plaintiff on the part of staff and prisoners and in order to punish Plaintiff and other prisoners, as alleged above in the "Facts" section, constitutes retaliation against Plaintiff for engaging in the protected activities of filing requests to staff, grievances, and state and federal court lawsuits, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

251.     As a result of this constitutional violation, Plaintiff suffered injuries and damages as described above.

## Count IV

First Amendment violation
Defendants Fisher, Hollibaugh, Robinson, Myers, Painter, Eichenlaub, Smith and Mitchell

April 2011 cell search and subsequent events

252.     Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

253.     Defendants Fisher, Hollibaugh, Robinson, Myers, Painter, Eichenlaub, Smith and Mitchell's actions, in conducting a harassing and intimidating investigation, in charging Plaintiff with baseless misconducts, in depriving Plaintiff of his property, in finding Plaintiff guilty of the misconduct charges despite the lack of evidence, in imposing and approving a 90-day RHU sentence on Plaintiff, and in instituting a campaign of intimidation against Plaintiff and other prisoners for their participation in legitimate grievance activity, as alleged above in the "Facts" section, constitutes retaliation against Plaintiff for engaging in the protected activities of filing requests to staff, grievances, and state and federal court lawsuits, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

254.     As a result of this constitutional violation, Plaintiff suffered injuries and damages as described above.

### Count V
First Amendment violation
Defendants Fisher, Hannah, Myers and Eichenlaub

Post-misconduct dismissal events

255. Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

256. Defendants Fisher, Hannah, Myers, and Eichenlaub's conduct, in keeping Plaintiff in the RHU without any AC privileges and in continuing to deprive Plaintiff of his property after his misconduct charges were dismissed, in imposing a separation order between Plaintiff and Inmate Wisniewski, and in transferring Plaintiff to another institution based on that separation order, as alleged above in the "Facts" section, constitutes retaliation against Plaintiff for engaging in the protected activities of filing requests to staff, grievances, and state and federal court lawsuits, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

257. As a result of this constitutional violation, Plaintiff suffered injuries and damages as described above.

## Count VI

Fourteenth Amendment violation
Defendants Fisher, Hannah, Robinson, Myers, Painter, Eichenlaub, and Mitchell

Misconduct proceedings and punishment

258. Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

259.    Defendants Fisher, Hannah, Robinson, Myers, Painter, Eichenlaub, and

Mitchell's conduct, in arranging for and levying baseless misconduct

charges against Plaintiff, in punishing Plaintiff through lengthy and

unjustified RHU placement and deprivation of property, all without

providing adequate or meaningful process, as alleged above in the "Facts"

section, constitutes a violation of Plaintiff's right to due process under the

Fourteenth Amendment to the United States Constitution.

260.    As a result of this constitutional violation, Plaintiff suffered injuries and

damages as described above.

### Count VII

Fourteenth Amendment violation
Defendants Fisher, Hannah

Post misconduct dismissal events

261.    Paragraphs 1 through 242 are incorporated herein by reference as

though fully set forth.

262.    Defendants Fisher and Hannah's conduct, in keeping Plaintiff in the

RHU without any AC privileges, after his misconduct charges were

dismissed, and in continuing to deprive Plaintiff of his property after his

misconduct charges were dismissed, all without providing adequate or

meaningful process, as alleged above in the "Facts" section, constitutes a

violation of Plaintiff's right to due process under the Fourteenth Amendment to the United States Constitution.

263.     As a result of this constitutional violation, Plaintiff suffered injuries and damages as described above.

## Count VIII

First Amendment violation
Defendants Fisher, Hollibaugh, Hannah, Robinson, Myers, Painter, Eichenlaub, and Mitchell

Punishment for communication

264.   Paragraphs 1 through 242 are incorporated herein by reference as though fully set forth.

265.   Defendants Fisher, Hollibaugh, Hannah, Robinson, Myers, Painter, Eichenlaub, and Mitchell's conduct, in punishing Plaintiff for his communications, as alleged above in the "Facts" section, constitutes a violation of Plaintiff's right to free speech under the First Amendment to the United States Constitution.

266.   As a result of this constitutional violation, Plaintiff suffered injuries and damages as described above.

## VI.   RELIEF

**WHEREFORE**, Plaintiff requests that this Court:

1.   Award declaratory relief that Plaintiff's constitutional rights were violated by Defendants;

47

2.  Issue an order directing Defendants to:

    A. cease all punitive / retaliatory conduct against Plaintiff;

    B. refrain from taking from taking any retaliatory actions against any individuals, including prisoners, prison staff, or DOC personnel, who assist Plaintiff in prosecuting this action;

    C. return all of Plaintiff's property still being withheld from Plaintiff;

    D. return (or reimburse) all property Plaintiff was forced to discard;

    E. expunge the record of all misconduct charges levied against Plaintiff in April 2011;

    F. reinstate Plaintiff's custody level and housing status;

    G. reinstate Plaintiff's job, job classification, awarding pay scale raises and back pay;

    H. reset Plaintiff's position for promotional transfer (2012);

    I. reinstate approval for Plaintiff to keep two boxes of legal materials in his possession;

    J. return all legal mail, attorney questionnaires and other items improperly confiscated as "contraband" or "petitions" from SCI-Smithfield prisoners;

K. reinstate block out and amphitheater yards at SCI-Smithfield;

3. Issue an order directing Defendants to implement a training program at SCI-Smithfield regarding inmates' First Amendment rights;

4. Award compensatory damages to Plaintiff against Defendants;

5. Award punitive damages to Plaintiff against Defendants;

6. Award the costs of this action to Plaintiff;

7. Award reasonable attorneys' fees to Plaintiff; and,

8. Award such other and further relief as this Court may deem appropriate.

Respectfully submitted,

s/ Jennifer J. Tobin

Date:  August 30, 2011

Jennifer J. Tobin
Attorney I.D. # PA 202047
PA Institutional Law Project
718 Arch Street, Ste. 304 South
Philadelphia, PA  19130
Tel:  215-925-2966
Fax:  215-925-5337
E:  jtobin@pailp.org

Attorney for Plaintiff Roger Buehl