# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROGER BUEHL,** | : | **CIVIL NO. 3:CV-10-2288** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **JON FISHER, et al.,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Roger Buehl ("Buehl" or plaintiff), at all times relevant, an inmate incarcerated at the State Correctional Institution at Smithfield (SCI-Smithfield), Pennsylvania, filed this civil rights action pursuant to 42 U.S.C. § 1983.  (Doc. 1).  The matter is proceeding *via* an amended complaint.  (Doc. 43).  Buehl alleges eight separate causes of action which are identified in the amended complaint as Count I through Count VIII.  Named as defendants are the following SCI-Smithfield officials/employees:  Jon D. Fisher, Superintendent ("Fisher"); Paul K. Smeal ("Smeal"), former Superintendent; Lisa Hollibaugh ("Hollibaugh"), Superintendent's Assistant; Daniel Myers ("Myers"), Intelligence Captain; Rodney Painter ("Painter"), Lieutenant; Kevin Smith ("Smith"), Corrections Officer; Donald Sullivan ("Sullivan"), Corrections Officer; Dorina Varner ("Varner"), Chief Grievance Officer; Charles Mitchell ("Mitchell"), Hearing Examiner; R. Susan Hannah ("Hannah"), Deputy Superintendent for Facility Management; Todd Robinson ("Robinson"), Major; and Joseph Eichenlaub ("Eichenlaub"), Lieutenant.  Counts VI and VII, which contained Fourteenth Amendment due process claims were dismissed by prior

order of Court.  (Doc.76, at 20.)  Presently pending is defendants' motion for summary

judgment in which they seek judgment on the  remaining claims First Amendment retaliation

and free speech claims contained in Counts I, II, III, IV, V, and VIII.   For the reasons set

forth below, the motion will be granted.

## I.    <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not

present a "genuine issue as to any material fact" and for which a jury trial would be an empty

and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  The burden of proof is upon the

non-moving party to come forth with "affirmative evidence, beyond the allegations of the

pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311,

315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,

322-23 (1986).  "'The non-moving party may not simply sit back and rest on the allegations

in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, and designate specific

facts showing that there is a genuine issue for trial.'  <u>Celotex [ ]</u>, 477 U.S. [ ] 324 [ ] (1986)

(internal quotations omitted)."  <u>Schiazza v. Zoning Hearing Bd., Fairview Twp., York</u>

<u>County, Pa</u>, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).  This evidence must be adequate, as a

matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u>

<u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co.</u>

<u>v. Zenith Radio Corp.,</u> 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(c), (e).  Only

if this threshold is met may the cause of action proceed.  <u>Pappa</u>s, 331 F. Supp. 2d at 315.

## II.   **Statement of Material Facts**

Buehl was incarcerated at SCI-Smithfield from 2007 until 2011.  (Doc. 93, ¶ 2; Doc. 101, ¶¶ 2, 94.)

### A.   **Count I**

Upon his arrival at SCI-Smithfield in 2007, plaintiff was assigned an H-Code classification, which is a high security custody status assigned to certain prisoners based on institutional behavior or a risk of escape.  (Doc. 101, ¶ 103; Doc. 110, at 11.)  When he first arrived in 2007, his H-Code status was based on institutional behavior.  (Id. at ¶ 104; Id.)  At some point prior to August 28, 2009, he was designated as an "Escape Risk."  (Doc. 94-3, ¶¶ 7, 9.)  He remains on the Escape Risk List at this time.  (Id.)  "Inmates on the Escape Risk List at SCI Smithfield are subject to quarterly investigative Cell Searches performed by an SCI Smithfield Cell Search Team."  (Id. at ¶ 4; Doc. 93, ¶ 10; Doc. 101, ¶¶ 10, 105-106.)  Investigative cell searches consist of a thorough search of the inmate's cell and personal property, looking for any indication that an inmate is planning to escape from the institution.  (Id.)  Defendant Myers, in his capacity as the Intelligence Captain at SCI-Smithfield's Security Office from 2003 to 2012, authorized investigative cell searches at SCI-Smithfield.  (Doc. 94-3, ¶¶ 1, 8.)  At the beginning of each quarter (the first quarter is January through March, the second quarter is April through June, the third quarter is July through September, and the fourth quarter is October through December), the Security Office secretary generates a list of the inmate's cells that are to be searched.  (Id. at ¶ 5; Doc. 93, ¶ 17; Doc. 101, ¶ 17.)  The Investigative Cell Search List is then given to the Cell Search Team, who has the entire

quarter to perform the investigative cell search.  (Doc. 93, at ¶ 15.)

Beginning in 2007, plaintiff filed institutional grievances and appeals questioning the shortening or canceling of outdoor yard because of inclement weather and the failure to offer indoor exercise when yard was cancelled.  He also filed written requests and appeals to the Pennsylvania Department of Corrections ("DOC"), pursuant to the Pennsylvania Right-to-Know Act ("RTKA"), 65 P.S. §§ 66.1, et seq., requesting the definitions of "inclement weather" utilized by the DOC and SCI-Smithfield.  (Id. at ¶ 4; Id. at ¶ 4.) Additionally, he filed RTKA appeals with the Pennsylvania Office of Open Records ("OOR") and the Commonwealth Court of Pennsylvania.  (Id. at ¶ 5; Id. at ¶ 5.)  On August 19, 2009, he filed a petition for writ of mandamus in the Commonwealth Court on the basis "that the Department of Corrections ha[d] failed to provide him and other inmates the physical exercise that is required by statute."  Buehl v. Beard, 54 A.3d 412, 414 (Pa. Cmwlth. 2012).  (Id. at ¶ 6; Id. at ¶¶ 6 , 97.)

Nine days after the mandamus petition was filed, on August 28, 2009, defendants Smith and Sullivan, members of the investigative cell search team, conducted an investigative search of plaintiff's cell based on plaintiff's "Escape Risk" designation.  (Id. at ¶¶ 7-8; Id. at ¶¶ 7-8, 98; Doc. 94-3, ¶ 9.)  Smith and Sullivan confiscated property items that had been in plaintiff's possession for a number of years.  (Doc. 101, at ¶ 100; Doc. 110, at 11.)  Defendant Myers, Intelligence Captain of the Security Unit, authorized the investigative search of plaintiff's cell; he did not specifically order the search to take place on August 28, 2009.  (Doc. 93, ¶ 18.)  Prior to, and including, the August 28, 2009 cell search, plaintiff was

4

subjected to five investigative searches at SCI-Smithfield.  (Doc. 101, ¶ 111; Doc. 110, at

13.)  The August 28, 2009, search was the only search conducted because of "escape risk."

(Id. at 112; Id.)

Plaintiff filed grievance No. 288002 concerning the August 28, 2009 cell search and

property confiscation.  (Doc. 93, ¶ 21; Doc. 101, ¶ 21.)  An established formal procedure for

inmates to bring concerns and complaints to the attention of prison officials is set forth in

DOC Administrative Directive 804 (DC-ADM 804), Inmate Grievance System. ( Id. at ¶ 23;

Id. at ¶ 23.)  Pursuant to DC-ADM 804, any inmate personally affected by a DOC or

institutional action or policy or by the action of a DOC employee is permitted to file a

grievance.  (Id. at ¶ 24; Id. at ¶ 24.)  The policy sets forth several requirements for any

grievance submitted.  (Id. at ¶ 26; Id. at ¶ 26.)  The grievance form, that is available on all

housing units or blocks, must be submitted in writing to the Facility Grievance Coordinator

(Id. at ¶ 25; Id. at ¶ 25.)  In the initial grievance, the inmate is required to include a statement

of facts relevant to the claim, which must be legible, understandable, and presented in a

courteous manner not exceeding two pages in length.  (Id. at ¶ 28; Id. at ¶ 28.)  The inmate is

further required to identify any persons with information that may be helpful in resolving the

grievance, specifically state any claims concerning violations of DOC directives, regulations,

court orders or laws,  and include any requests for specific relief.   (Id. at ¶¶ 29-31; Id. at ¶¶

29-31.)

The Grievance Officer provides an written Initial Review Response to the inmate

within ten working days of receipt of the grievance with a copy provided to the Facility

Grievance Coordinator.  (Doc. 93, ¶ 32; Doc. 101, ¶ 32; Doc. 94-4, at 14-15.)  If the inmate is dissatisfied with the Initial Review Response, the inmate may appeal the decision to the Facility Manager or Superintendent raising "only issues raised for Initial Review."  (Doc. 93, ¶ 33; Doc. 94-4, at 15.)  Any inmate who is dissatisfied with the decision of the Facility Manager or Superintendent may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA").  (Doc. 93, ¶ 34; Doc. 101, ¶ 34.)  Only issues raised in both the original grievance and the appeal to the Facility Manager or Superintendent may be appealed at this level.  (Id. at ¶ 35 ; Id. at ¶ 35; Doc. 94-4, at 17.)  Along with the appeal, the inmate must include copies of the original grievance, the Initial Review Response, the Appeal to the Superintendent and the Superintendent's Response.  (Doc. 93, ¶ 36; Doc. 101, ¶ 36.)

In Grievance No. 288002, plaintiff identified the confiscated items, took issue with the reasons for confiscation, and stated his desired remedies, but did not challenge the basis for the investigative cell search or claim that the search was retaliatory.[1]  (Doc. 93, ¶¶ 37-38; Doc. 101, ¶¶ 37-38.)  Portions of the grievance were resolved and portions were denied. (Doc. 94-4, at 56; Doc. 101, ¶ 40.)  Plaintiff appealed the grievance to the Superintendent, defendant Smeal.  (Doc. 93, ¶ 40; Doc. 101, ¶ 40.)  In the appeal, plaintiff states that "[t]he initial review response affirms the confiscation of my property items which are usually ignored, and indeed, were checked and then ignored through numerous cell searches over the

---

[1]Although defendants did not attach page 2 of Grievance 288002, page 2 was filed earlier in this matter and can be found at Doc. 7-2, p. 3.

years.  Such action, and the review response refusal to allow for a repair of my lamp,

evidences purposeful harassment and/or retaliation, possibly due to my grievance and

litigation activities."  (Doc. 93, ¶ 41; Doc. 101, ¶ 41; Doc. 94-4, at 57.)  Pursuant to

DC-ADM 804, only issues raised in the inmate's initial grievance may be appealed.  (Doc.

93, ¶ 42; Doc. 101, ¶ 42).  In the final appeal decision, the confiscation of property issues

raised in the initial grievance were addressed and plaintiff was notified that "[a]ny issues not

included in your initial grievance will not be addressed at final review."  (Doc. 94-4, at 61.)

Buehl expressed his concern about possible retaliation to Deputy Superintendent

Eckert verbally and in writing in an Inmate Request to Staff Member Form.  (Id. at ¶¶ 118-

19; Doc. 102-7, at 9.)  In his reply to the written request, Deputy Superintendent Eckert

explained that the search had been conducted because Mr. Buehl's cellmate was on the

"escape risk" list.  (Id. at ¶ 120, Id.).

### B.     Count II

On September 18, 2009, approximately two weeks after the investigative cell search,

defendant Painter informed plaintiff that publically available docket sheets had been

confiscated from plaintiff's incoming mail.  (Doc. 93, ¶ 44; Doc. 101, ¶¶ 44, 122)  Officials

labeled the docket reports as "contraband."  (Doc. 101, ¶ 123.)  Plaintiff filed grievance No.

290426 stating that defendant Painter confiscated the docket sheets with the approval of

defendant Hollibaugh and that the confiscation was intended to retaliate against him in order

to prevent him from filing grievances and engaging in other litigation activities.  (Doc. 93 at

¶¶ 44-46, 52; Doc. 101 at ¶¶ 44-46, 52).  Although there were no allegations against

defendants Smeal, Myers, or Varner, plaintiff indicated that the grievance concerned actions taken by the Security Office.  (Id. at ¶ 47; Id. at ¶ 47.)  Grievance No. 290426 was reviewed by Defendant Myers and denied. (Doc. 93, ¶ 48; Doc. 101, ¶ 48.)  Plaintiff appealed the grievance through all levels of review and the initial denial was upheld.  (Id. at ¶¶ 49-51; Id. at ¶¶ 49-51.)  This was in direct contravention of a 2008 Final Appeal Decision by the Chief Grievance Officer, which expressly permitted plaintiff to receive and possess these documents.  (Doc. 101, ¶ 124.)  The rationale provided by SCI-Smithfield officials for the confiscation was identical to that rejected in the 2008 Final Appeal Decision.  (Id. at ¶ 125.)  SCI-Smithfield officials provided no additional supporting reasons for the interception and confiscation of these documents. (Id. at ¶ 126.)

Following the confiscation of the docket sheets, plaintiff continued to filed grievances.  (Doc. 93, ¶ 53; Doc. 101, ¶ 53.)  The DOC's Grievance Tracking System reveals that plaintiff has filed at least forty-six grievances since September 18, 2009.  (Id. at ¶ 53; Id. at ¶ 53.)  Plaintiff also filed numerous Right-to-Know requests with the Office of Open Records ("OOR") and continued to pursue state court action in the Pennsylvania Commonwealth Court for unfavorable OOR decisions.  (Id. at ¶¶ 4-5; Id. at ¶¶ 4-5.)  He also continued pursuit of his mandamus action in the Pennsylvania Commonwealth Court.  (Id. at ¶ 6; Id. at ¶ 6.)

## C.    Count III

In the spring of 2011, SCI-Smithfield instituted new yard and block out policies. (Doc. 101, ¶ 130).  These policies required that yard be offered in all weather conditions

except during fog and lightening.  (<u>Id.</u> at ¶ 131).  Staff complained openly about these changed yard policies, which required them to stand outside in the rain.  (<u>Id.</u> at ¶ 132).  Numerous correctional officers openly attributed these changes to plaintiff's lawsuits.  (<u>Id.</u> at ¶ 133.)  Inmates who chose not to go to yard during inclement weather were permitted to stay inside and spend time outside of their cells playing cards with other inmates, watching television or participating in other activities.  (<u>Id.</u> at ¶ 134.)  This was called "block out." (<u>Id.</u> at ¶ 135.)  On March 23, 2011, SCI-Smithfield administration changed the "block out" and yard policy such that if yard was offered to an inmate, "block out" would not be offered.  (<u>Id.</u> at ¶ 136.)  If an inmate chose not to participate in yard, he would have to stay locked in his cell.  (<u>Id.</u>)  The changes to yard/block out policy upset many prisoners, including plaintiff, as they reduced overall out-of-cell time.  (<u>Id.</u> at ¶ 137.)  When inmates complained to guards about these new policies, they were told that they should "blame it on the guy who is suing" or words to that effect, referencing plaintiff.  (<u>Id.</u> at ¶ 138.)

On March 29, 2011, plaintiff submitted Grievance No. 359561 complaining of the new yard/block-out schedule.  (Doc. 93, ¶ 54; Doc. 101, ¶ 54.)  The grievance was denied.  (<u>Id.</u> at ¶ 55; Id. at ¶ 55.)  Plaintiff appealed the denial to defendant Fisher and then defendant Varner in the SOIGA.  (<u>Id.</u>)  Defendant Varner dismissed the grievance because plaintiff failed to provide a photocopy of his original grievance.  (<u>Id.</u> at ¶¶ 56-57; <u>Id.</u> at ¶¶ 56-57.)  The dismissal specifically provides that "[w]hile you state that the original grievance was confiscated along with all of your legal material and that your request for access has been ignored, you provide no evidence to suggest that you tried to get a copy of the necessary

documents." (Id. at ¶ 58; Id. at ¶ 58.)  The Inmate Grievance System Manual provides that "[a]n inmate appealing a grievance to Final Review is responsible for providing the SOIGA with all required documentation relevant to the appeal.  A proper appeal to Final Review must include photocopies of the Initial Grievance . . .   Failure to provide the proper documentation may result in the appeal being dismissed."  (Doc. 94-4, at 43.)  Plaintiff's failure to provide the SOIGA with a photocopy of his original grievance resulted in a failure to comply with the DOC's grievance procedure.  (Id. at ¶ 59; Id. at ¶ 59.)  Without a copy of the original, the SOIGA has no assurance that the grievance has been supplied is the original grievance and, therefore, it cannot make a proper decision on the appeal.  (Id. at ¶ 60.)

### D.    Count IV

After plaintiff filed the March 29, 2011 grievance, other inmates who were upset about the yard/block out changes approached plaintiff seeking advice on how to word their grievances on the issue.  (Doc. 101, ¶ 139.)  Plaintiff gave each prisoner that approached him an edited draft of the text of his March 29, 2011 grievance and told him that he could use or modify it as he wished.  (Id. at ¶ 141.)  Plaintiff had no further interaction with these inmates in connection with their grievances.  (Id. at ¶142.)

On April 4, 2011, library staff at SCI-Smithfield confiscated a typewritten statement from an Inmate Wisniewski and sent the statement to the SCI-Smithfield Security Office.  (Doc. 93, ¶ 61; Doc. 101, ¶¶ 61, 143.)  On April 6, 2011, defendant Hollibaugh, the SCI-Smithfield grievance coordinator, received ten grievances, from ten different inmates, containing the same exact language.  (Id. at ¶ 62; Id. at ¶ 62.)  Defendant Hollibaugh

forwarded the ten grievances to the Security Office.  (Id. at ¶ 63; Id. at ¶ 63.)  Upon

examination, defendant Myers noticed that the language in the ten grievances matched the

typewritten statement confiscated from Inmate Wisniewski.  (Id. at ¶ 64; Id. at ¶ 64.)

Security Office personnel interviewed Inmate Wisniewski, who stated that plaintiff had typed

the confiscated statement and was organizing SCI Smithfield inmates to bombard the

grievance coordinator with grievances.  (Id. at ¶ 65.)  Inmate Wisniewski also stated that

plaintiff was passing out attorney questionnaires to inmates to fill out and send to an outside

law firm.  (Id. at  ¶ 66.)

On April 6, 2011, an Investigative Cell Search was conducted on plaintiff's cell to

look for evidence that he was organizing inmates without authorization, which is against

DOC rules and regulations.  (Doc. 93, ¶ 69.)  Specifically, they were seeking documents

related to the identical grievances and the attorney questionnaires.  (Id. at ¶ 67.)  The search

was conducted by Corrections Officers Wertz and Hazlett.  (Id. at 68; Doc. 101, ¶ 68.)  The

officers told plaintiff that they had been instructed by the Security Department to confiscate

all documents in his possession related to the mandamus exercise lawsuit and the grievances

about yard and block-out.  (Doc. 101, ¶ 145.)   Plaintiff's electric typewriter, a blank exercise

questionnaire, and legal papers were confiscated.  (Id. at ¶ 147.)  The search revealed that the

memory on plaintiff's typewriter contained the grievance language found on the statement

confiscated from Inmate Wisniewski and the same language on the grievances submitted by

other inmates.  (Doc. 93, ¶ 70.)  Defendant Eichenlaub, in his capacity as a lieutenant

employed in the Security Office, placed plaintiff on Administrative Custody ("AC") Status

and transferred him to the Restricted Housing Unit (RHU) because he was under investigation for violations of institutional rules. (Id. at ¶ 71-72; Doc. 101, ¶¶ 71, 148.)

Between April 6, 2011 and April 11, 2011, inmates who submitted identical grievances to the grievance language on plaintiff's typewriter memory were interviewed by Security Office personnel. (Doc. 93, ¶ 73; Doc. 101, ¶ 73.) The inmates who were interviewed identified plaintiff as the source of the grievance and reported that plaintiff had encouraged them to complete the questionnaire and mail it to his attorney. (Id. at ¶ 74-75; Id. at 74-75.) On April 11, 2011, he received a misconduct report charging him with engaging in, or encouraging, unauthorized group activity, possession or circulation of a petition, and possession of contraband. (Doc. 101, ¶ 149.)

Plaintiff's hearing on the misconduct charges was delayed until April 18, 2011, to enable the Hearing Examiner, defendant Mitchell, to consult with defendant Eichenlaub, the author of the misconduct report. (Doc. 101, ¶ 150.) Following a hearing, at which no witnesses were called, defendant Mitchell found plaintiff guilty of all three charges and imposed a sentence of ninety days confinement in the RHU. (Id. at ¶¶ 151-152.) Defendant Mitchell's finding of guilt was based on the draft grievance text being a "petition" and thus, "contraband." (Id. at ¶ 153.) Plaintiff appealed to the Program Review Committee ("PRC"), which denied the appeal on the basis that the attorney questionnaire constituted a "petition" and was therefore unauthorized "contraband." (Id. at ¶ 155.) Plaintiff appealed to defendant Fisher who upheld the previous decisions. (Id. at ¶ 156.) Plaintiff appealed to the Chief Hearing Examiner. (Id. at ¶ 157.) After four weeks in the RHU, plaintiff was notified that

the Chief Hearing Examiner recommended that the case be remanded to the institution for a new hearing; the DOC Acting Deputy Secretary concurred in this recommendation. (Id. at ¶ 158.) All charges against plaintiff were ultimately dismissed. (Id. at 159.)

Plaintiff filed Grievance No. 362165 complaining that the April 2011 cell search and confiscation of property violated DOC policy. (Doc. 93, ¶ 82; Doc. 101, ¶82.) He grieved the search and confiscation of his property by Corrections Officer Wertz and requested that the grievance officer consider that security staff was ordered to confiscate these items in retaliation for the filing of grievances and litigation against defendants Fisher, Hollibaugh, Myers, and Painter. (Id. at ¶¶ 83-84; Id. at ¶¶ 83-84.) The grievance did not identify who ordered the security staff to conduct the search for alleged retaliatory reasons; nor did it name defendants Robinson, Eichenlaub, Smith or Mitchell. (Id. at ¶¶ 85-86; Id. at ¶ 85-86.)

**E.  Count V**

On May 19, 2011, defendant Myers recommended that at the expiration of his disciplinary custody status, plaintiff should remain in the RHU on AC status and that he should be transferred to another institution. (Doc. 93, ¶¶ 76-77; Doc. 101, ¶¶ 76-77.) The recommendation was based on the following factors: "a. SCI Smithfield regularly has more than 1,125 inmates housed at the facility. Exhibit 3 ¶11.  b. With a shift complement of 75 to 100 officers per shift, the inmates vastly out-number the corrections officers. Exhibit 3 ¶11. c. The Department forbids unauthorized group activities by inmates as a security issue. Exhibit 3 ¶11.  d. Such activities can lead to groups of inmates banding together disobeying orders of the corrections officers, defying the Institution's rules and regulations, and could

lead to inmates taking over control of the institution and placing the community outside the institution at risk. Exhibit 3 ¶11.  e. Smaller unauthorized groups of inmates can prey on other inmates, forcing these inmates to turn over commissary items; file false complaints against other inmates and staff; and create situations where inmates attempt to control other inmates physically and emotionally. Exhibit 3 ¶11." (Doc. 93, ¶ 80.)  Defendant Myers concluded that plaintiff posed a danger to Inmate Wisniewski, who had informed the Security Office of plaintiff's activities.  (Doc. 93, ¶ 78.)  He recommended that plaintiff be separated from SCI-Smithfield because he had caused a disruption to the orderly running of the institution in that he had organized numerous inmates together and attempted to use his power over these inmates against SCI-Smithfield administration.  (Doc. 93, ¶ 79; Doc. 101 ¶ 79.)  In doing so, he noted the staff to inmate ratio strongly favored inmates, and the DOC's policy forbidding unauthorized group activities, which can potentially cause significant security risks to institutions. (Doc. 93, ¶ 80.)  On June 30, 2011, plaintiff's custody status was changed from Disciplinary Custody status to AC status and he remained in the RHU pending a separation transfer to another facility.  (Doc. 93, ¶ 81; Doc. 101, ¶ 81.)

In accordance with DC-ADM 802, Administrative Custody Procedures Manual," if an inmate placed in AC status has an issue with the "placement in AC custody or the duration, conditions or other circumstances of his/her AC custody" he must raise such issues during the regularly scheduled PRC review.  (Doc. 102-23, at 13.)  Plaintiff had a hearing before the PRC on July 7, 2011, regarding his continued detention in the RHU whereat he was informed that he would remain on AC status, in the RHU, pending a separation transfer,

based on a separation between himself and Inmate Wisniewski.  (Doc. 101, ¶¶ 161-62.)

Plaintiff objected and defendant Hannah disregarded this objection.  (Id. at ¶¶ 163-64.)

Plaintiff requested AC status privileges; defendant Hannah denied the request, stating that he

was "not eligible yet." (Id. at ¶ 165.)  At the conclusion of the review, "[plaintiff] was

informed of his 802 appeal rights." (Doc. 102-19, at 7.)  On July 25, 2011, defendant Fisher

sustained defendant Hannah's decisions to continue plaintiff in AC status without privileges,

and to carry out a "separation transfer." (Id. at ¶ 166; Doc. 102-19, at 3.)  Defendant Fisher

stated as follows: "I have reviewed the Program Review Committee Action from 7/7/11 and

your appeal of such.  A thorough discussion with security staff reveals a continued need for

your AC placement and subsequent transfer.  This has nothing to do with past grievance

issues nor lawsuits.  It simply has to do with the security of the institution under DC-ADM

802.  I support you continued housing on AC status based on this information.  (Doc. 102-19,

at 3.)  Plaintiff remained in the RHU, without privileges or access to his property, from April

6, 2011 to August 9, 2011, at which time he was transferred to the State Correctional

Institution at Mahanoy. (Doc. 101, ¶ 167.)

>  **F.    Count VIII**

On July 6, 2011, plaintiff filed Grievance No. 371964, which related to the April 2011

cell search and confiscation of property.  (Doc. 93, ¶ 89; Doc. 101, ¶ 89.)  The grievance

stated: "Security officers were ordered to confiscate these items from my cell to penalize my

speech/association, grievances and litigation activities, and to disrupt my access to courts in

the matters of Buehl v. Fisher (PAMD) and Buehl v. Bearn (PA CMWLTH).  The

15

confiscation/penalization described herein above are in retaliation for my past and present grievance/litigations making claims against Supt. Fisher, Ms. Hollibaugh, Capt. Myers, and Capt. Painter, all in violation of constitutional guarantees, PA law and DOC policy. . . ." (Doc. 93, ¶ 90; Doc. 101, ¶ 90; Doc. 94-4, at 184.)  It identified Corrections Officer Wertz as the searching and confiscating officer, but did not identify who ordered the search for alleged retaliatory reasons.  (Doc. 93, ¶¶ 91-92; Doc. 101, ¶¶ 91-92.)  It referenced the Security Staff but did not name defendants Hannah, Robinson, Eichenlaub, or Mitchell.  (Doc. 93, ¶ 93; Doc. 94-4, at 184.)

## III.   Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."

West v. Atkins, 487 U.S. 42, 48 (1988).

### A.   Administrative Exhaustion

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions.  See 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001).  The exhaustion requirement is mandatory, see Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  There is no "futility" exception to the administrative exhaustion requirement and dismissal of a claim is appropriate when a prisoner has failed to exhaust his available administrative remedies before bringing a civil-rights action.  Ahmed v. Dragovich, 297 F.3d 201, 206 (3d Cir. 2002) (citing Nyhuis v. Reno, 204 F.3d 65, 78 (3d Cir.2000)).

Courts have also imposed a procedural default component on the exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court.  Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).  Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims

17

in federal court.  See Spruill, 372 F.3d 218.  "As for the failure to identify named defendants

on the grievance form, . . . to the extent the identity of a defendant was "a fact relevant to the

claim," Pennsylvania's prison grievance policy mandate[s] that the identification be included

in the inmate's statement of facts on the grievance form.  And, . . . in the absence of any

justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant

constitute[s] a failure to properly exhaust his administrative remedies under the PLRA."

Williams v. Pennsylvania Dep't. of Corr., 146 F. App'x 554, 557 (3d Cir. 2005).

        1.    Count I

Defendants contend that prior to filing this suit, Buehl failed to exhaust his

administrative remedies with respect to Count I in that he "identified the confiscated items,

took issue with the reasons for confiscation, and stated his desired remedies; however,

Plaintiff never challenged the basis for the search including his claim that the search was

retaliatory" in Grievance 288002 as required by DC-ADM 804.  (Doc. 95, at 7.)  Rather,

plaintiff first raised retaliation on appeal when he stated that "[t]he initial review response

affirms the confiscation of my property items which are usually ignored, and indeed, were

checked and then ignored through numerous cell searches over the years.  Such action, and

the review response refusal to allow for a repair of my lamp, evidences purposeful

harassment and/or retaliation, possibly due to my grievance and litigation activities."  (Doc.

93, ¶ 41; Doc. 101, ¶ 41; Doc. 94-4, at 57.)  Retaliation is a separate claim and prisoners must

raise the specific claim of retaliation in their prison grievance in order to exhaust

administrative remedies.  See Boyd v. United States, 396 F. App'x 793, 796 (3d Cir. 2010)

(holding that "to pursue a claim in federal court based on retaliation, [a prisoner] must first have exhausted administrative remedies for that claim."); see also Hoffenberg v. Provost, 154 F. App'x 307, 311 (3d Cir. 2005) (finding that a retaliation claim must be presented and exhausted as a separate claim from underlying assault claim).  As all parties concede, Buehl's initial grievance made no mention of retaliation.  The record before the Court as to plaintiff's exhaustion efforts with respect to the retaliation claim is clear.  Plaintiff failed to properly exhaust his available administrative remedies with regard to the claim raised in Count I before filing this action, and, thus, defendants are entitled to summary judgment on all the retaliation claim contained in Count I.  See Oriakhi v. United States, 165 F. App'x. 991, 993 (3d Cir. 2006).

Moreover, although Buelh names defendants Smith and Sullivan in his appeal to the defendant Smeal, at no time during the grievance process does he identify Smeal, Myers, or Painter.  As indicated above, it is well-settled that the failure to identify the named defendants in the grievance filed at the administrative level results in a bar to proceeding against those defendants in federal court.

2.    Counts II, IV and VIII

Named in Count II, wherein plaintiff is challenging the September 2009 confiscation of docket sheets, are defendants Smeal, Myers, Painter, Hollibaugh and Varner.  Defendants seek judgment on Count II in favor of Smeal, Myers and Varner based on plaintiff's failure to identify them in Grievance 290426 as being responsible for the challenged action.  In Count IV, which challenges the April 6, 2011 search, plaintiff names as defendants Fisher,

Hollibaugh, Robinson, Myers, Painter, Eichenlaub, Smith and Mitchell.  Summary judgment is sought in favor of defendants Robinson, Eichenlaub, Smith and Mitchell due to plaintiff's failure to include them in Grievance 362165, which challenged the April 6, 2011 cell search. Likewise, defendants are seeking an entry of judgment on Count VIII as to defendants Fisher, Hollibaugh, Hannah, Robinson, Myers, Painter, Eichenlaub and Mitchell for failure to name them in  Grievance 371964 which concerned violations of plaintiff's free speech.

As stated above, inmates who fail to identify the named defendants in the grievance filed at the administrative level are barred from subsequently litigating claims against those defendants in federal court.  Therefore, summary judgment will be entered in favor of defendants Smeal, Myers and Varner on Count II.  The merits of Count II will be considered as to defendants Painter and Hollibaugh.  Judgment will be granted in favor of defendants Robinson, Eichenlaub, Smith and Mitchell on Count IV.  The merits will be considered with respect to defendants Fisher, Hollibaugh, Myers and Painter.  With respect to Count VIII, because there is no mention of defendants Hannah, Robinson, Eichenlaub and Mitchell in Grievance 371964, they are entitled to an entry of summary judgment.  However, the Court will consider the merits of Count VIII as to defendants Fisher, Hollibaugh, Myers, and Painter as plaintiff's reference to them by name in Grievance 371964 was sufficient to place them on notice.

3.   Count III

Defendants seek judgment on Count III based on plaintiff's failure to comply with exhaustion procedures with respect to Grievance 359561 wherein plaintiff claimed that

defendants Fisher, Hannah and Robinson retaliated against him for his grievance and litigation practices by implementing changes in yard and block-out policies.  Specifically, on appeal, Defendant Varner dismissed plaintiff's grievance because he failed to provide a photocopy of his original grievance.  In dismissing the grievance appeal, defendant Varner provides that "[w]hile you state that the original grievance was confiscated along with all of your legal material and that your request for access has been ignored, you provide no evidence to suggest that you tried to get a copy of the necessary documents."  (Doc. 93, ¶ 58; Doc. 101, ¶ 58.)  "An inmate appealing a grievance to final review is responsible for providing the Secretary's Office of Inmate Grievances and Appeals with all required documentation relevant to the appeal.  A proper appeal to final review shall include photocopies of the initial grievance. . . .   Failure to provide the proper documentation may result in the appeal being dismissed."  (Doc. 94-4, at 18.)

Plaintiff's failure to provide the SOIGA with a photocopy of his original grievance resulted in a failure to comply with administrative review procedures.  It is undisputed that the photocopy of the original grievance requirement contained in DC-ADM 804 is mandatory in that it states that "[a]n inmate appealing a grievance to Final Review is responsible for providing the SOIGA with all required documentation relevant to the appeal.  A proper appeal to Final Review must include photocopies of the Initial Grievance. . . .   Failure to provide the proper documentation may result in the appeal being dismissed."  (Doc. 94-4, at 43.)  Plaintiff does not dispute that his failure to provide the SOIGA with a photocopy of his original grievance resulted in a failure to comply with the DOC's grievance procedure.  (Doc.

93, ¶ 59; Doc. 101, at ¶ 59.)  Rather, in an effort to excuse the exhaustion requirement, he

contends that the process was "unavailable" based on the confiscation of his original

grievance.  (Doc. 100, at 29.)  However, he provides no evidence in support of this argument.

He does not indicate when, why, or how his original grievance was confiscated.  Nor does he

indicate that he made any effort whatsoever to obtain a photocopy of the original grievance

from another source.  See Mack v. Kloptoski, 540 F. App'x 108, 111-113 (3d Cir. 2013.)

Consequently, defendants are entitled to an entry of summary judgment on Count III.

        4.     Count V

     Defendants argue that plaintiff failed to exhaust the retaliation claim related to his

confinement in the RHU on AC status "via the Department's internal administrative review

process."  (Doc. 95, at 39.)  Plaintiff counters that, because he was on AC status, he was

required to utilize DC-ADM 802, not DC-ADM 804, and that he did, in fact, utilize DC-

ADM 802, and completely exhausted the issues raised in Count V.  (Doc. 100, at 29-30.)

     On June 1, 2011, the Administrative Custody Procedures Policy, DC-ADM 802, was

amended to provide that "[a]ll issues concerning an inmate's placement in AC custody or the

duration, conditions or other circumstances of his/her AC custody must be addressed through

the procedures set forth in this directive and may not be addressed through the procedures set

forth in DC-ADM 801 or DC-ADM 804. An inmate is required to raise any issue concerning

the duration or other conditions of his/her AC custody during the regularly scheduled PRC

review."  DC-ADM 802 § 2.D.9.  This provision was in effect in July 2011, when plaintiff

was in administrative custody and advised that he was ordered separated from Inmate

Wisniewski, slated for transfer, and continued on AC status.[2]  It is clear from the record that

the issues raised in Count V are administratively exhausted in that plaintiff fully utilized DC-

ADM 802 per DOC policy.  (Doc. 102-19, at 2-8.)

     However, as with Counts I and IV, because plaintiff failed to identify the named

defendants in any manner throughout the DC-Adm 802 proceedings, he is barred from

subsequently litigating claims against those defendants in federal court.  Summary judgment

will be entered in favor of defendants Fisher, Hannah, Myers and Eichenlaub on Count V.

    **B.**    **Merits**

        1.    Retaliation Claims

     The First Amendment offers protection for a wide variety of expressive activities.  See

U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context,

where legitimate penological interests must be considered in assessing the constitutionality of

official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Retaliation for expressive

activities can infringe upon an individual's rights under the First Amendment.  See Allah v.

Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42

U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2)

that he suffered an "adverse action" by government officials; and (3) that there is "a causal

link between the exercise of his constitutional rights and the adverse action taken against

---

    [2]Prior to the June 1, 2011 amendment, DC-ADM 802 had been interpreted to "govern
[ ] only challenges to initial or continued confinement in administrative custody," and not to
preclude inmates from seeking administrative relief under DC–ADM 804 regarding other
issues.  Lyons v. Beard, No. 07–2278, 2009 WL 604139, at *5 (M.D.Pa. Mar. 9, 2009).

him." Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).

The court employs a burden-shifting regimen to determine whether a causal link exists. The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him. See id. (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action even in the absence of the protected activity. See id. If defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. See id. at 334.

### a.    Count I

Plaintiff's failure to exhaust the administrative review process has been deemed fatal to his pursuit of the retaliation claim contained in Count I. Significantly, even if he had properly exhausted the administrative review process, the claim would not survive summary judgment. First, the record is devoid of any evidence that defendants Smeal, Myers and Painter were personally involved in retaliatory conduct.

Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). Liability "cannot be predicated solely on the operation of respondeat superior." Id. In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the

alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003); Rode, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow. Atkinson, 316 F.3d at 271; Rode, 845 F.2d at 1207-08.

According to the record, the August 28, 2009 investigative cell search of plaintiff's cell was one of a number of cells on the list of the investigative cell searches authorized by defendant Myers at the beginning of the third quarter in July 2009. Myers was not present during the cell search; the search was conducted by defendants Smith and Sullivan. According to Myers, plaintiff's cell was searched because plaintiff was designated as an "Escape Risk." Plaintiff disputes the reason for the cell search offered by Myers arguing that the response he received from Deputy Superintendent Eckard stated that the search was due to plaintiff's cellmate's H-Code status. He argues that "the legitimacy of this proffered basis for the search is brought into doubt by numerous other facts in record. These statements provide sufficient evidence of Defendant Myers' personal involvement in the retaliatory conduct at issue." (Doc. 100, at 31.) The Court disagrees. A dispute concerning the reason for the search does not demonstrate that defendant Myers was personally involved in ordering the search  based on retaliatory motive. Rather, the dispute confirms that the search was ordered based on the H-Code status of the inmates housed in the cell.

As concerns defendants Smeal and Painter, the record demonstrates that the involvement of these defendants was limited to their review of plaintiff's grievance. It is

well-settled that "participation in the after-the-fact review of a grievance or appeal is insufficient to establish personal involvement on the part of those individuals reviewing grievances." Wilkerson v. Schafer, No. 4:09-cv-2539, 2011 WL 900994, at *7 (M.D. Pa. 2011) (internal citations omitted).  Similarly, the "denial of a grievance or mere concurrence in an administrative appeal process is insufficient to establish personal involvement." Palmer v. Rustin, No. 10-42, 2011 WL 2489820, *10  (W.D. Pa. 2011); see also Mincy v. Klem, No. 1:08-cv-0066, 2011 WL 846080, at * 5 (M.D. Pa. 2011).  Plaintiff does not argue to the contrary.  (Doc. 100, at 15, 30-31.)

With respect to defendants Smith and Sullivan, even assuming that the plaintiff was able to meet the first two prongs of the Rauser test, he is unable to satisfy the third prong.  As noted *supra*, the record demonstrates that the search was ordered based on the H-Code status of either plaintiff or his cellmate.  Consequently, plaintiff cannot, and has not, demonstrated that the filing of grievances and the engaging in litigation was the substantial motivating factor behind the decision to search plaintiff's cell.

### b.      Counts II

It is undisputed that plaintiff meets the first prong as the filing of prison grievances and the pursuit of litigation constitutes protected conduct sufficient to meet the first prong. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003).  As to the second prong, to show an "adverse action," the plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F. Supp.2d 520, 535 (E.D.Pa. 2002) (quoting Allah, 229 F.3d at 225.)

Defendants argue that the September 2009 confiscation of docket sheets for cases involving other inmates does not constitute conduct "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." (Doc. 95, at 27.) Plaintiff disagrees. He argues that the confiscation of court docket sheets is "a quintessential 'adverse action' under the First Amendment." (Doc. 100, at 15.) Plaintiff fails to recognize that the adverse action prong requires demonstration that the confiscation of public docket sheets of cases being litigated by other inmates would be sufficient to deter a person of ordinary firmness from exercising his constitutional rights. He provides no such evidence. In fact, his own conduct provides evidence to the contrary. Following the confiscation of the docket sheets, plaintiff continued to file grievances. (Doc. 93, ¶ 53; Doc. 101 ¶ 53.) The DOC's Grievance Tracking System revealed that he filed at least forty-six grievances since September 18, 2009. (Id. at ¶ 53; Id. at ¶ 53.) He also filed numerous Right-to-Know requests with the OOR and continued to pursue state court action in the Pennsylvania Commonwealth Court for unfavorable OOR decisions. (Id. at ¶¶ 4-5 ; Id. at ¶¶ 4-5.) He also continued pursuit of his mandamus action in the Pennsylvania Commonwealth Court. (Id. at ¶ 6; Id. at ¶ 6.) Moreover, in his declaration, he fails to indicate that the action was adverse in any manner. (Doc. 102-1.) See Gill v. Tuttle, 93 F. App'x 301, 303–04 (2d Cir. 2004) (to establish retaliation claim, inmate must allege adverse action that imposes a substantial impact on inmate). The party opposing a motion for summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere

27

suspicions.  <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  Buehl

has failed to meet this burden.  Defendants Myers, Painter and Hollibaugh are entitled to an

entry of summary judgment on Count II.

### c.    Count III

Even if plaintiff had exhausted his administrative remedies with respect to the purported retaliation based on the change in the yard and block out policy contained in Count III,  defendants would still be entitled to an entry of summary based on plaintiff's failure to establish adverse action, as discussed in Count II, *supra*.

### d.    Count IV

In Count IV, plaintiff alleges that defendants Fisher, Hollibaugh, Myers and Painter had his cell searched on April 6, 2011, confiscated property and had him disciplined in retaliation for the filing of grievances and engaging in litigation activity.  Defendants first seek summary judgment based on a lack of personal involvement.  Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)).  "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . .  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d at 1207-08; see also, Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003).  Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible.  Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or

involvement in depriving the plaintiff of his rights is insufficient to establish personal

involvement. Rode, 845 F.2d at 1208.

It is undisputed that plaintiff's cell was searched by Corrections Officers Wertz and

Hazlett, not defendants Fisher, Hollibaugh, Myers or Painter.  Plaintiff's retaliation claim

against defendant Hollibaugh is rooted in his role in reporting the ten identical grievances to

the security office.  (Doc. 100, at 32.)  Clearly the simple act of reporting identical grievances

to the security office does not constitute unconstitutional conduct.  The retaliation claim

against defendant Myers is based solely on his employment in the security office and lacks

the particulars of conduct, time, place, or manner. (Id.)

With respect to defendants Fisher and Painter, plaintiff argues that they were personally

involved in retaliation based on their roles in reviewing plaintiff's custodial status while he was

confined to the RHU.  However, the mere concurrence in an administrative appeal process is

insufficient to establish personal involvement necessary for liability in a Section 1983 action.

See Simonton v. Tennis, 437 F. App'x  60, 62 (3d Cir.  2011) (stating that "[A] prison

official's secondary review of an inmate's grievance or appeal is not sufficient to

demonstrate the personal involvement required to establish the deprivation of a constitutional

right."); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state

prisoner's allegation that prison officials and administrators responded inappropriately, or

failed to respond to a prison grievance, did not establish that the officials and administrators

were involved in the underlying allegedly unconstitutional conduct). See also Coulston v.

Glunt, No. 12-154J, 2014 WL 808762, at * 5 (W.D. Pa. Feb. 28, 2014);  Wilkerson v.

Schafer, No. 09–2539, 2011 WL 900994, at *7 (M.D.Pa.  Mar.14, 2011) (holding that allegations that defendants "should be held liable for due process violations because they should have become aware of them through their review of his misconduct appeals is insufficient to establish their personal involvement in the underlying unconstitutional conduct").  These defendants are entitled to an entry of summary judgment.[3]

### e.     Count V

Alternative consideration of the merits of the unexhausted claim set forth in Count V, also results in judgment in favor of defendants.  Count V contains a claim of retaliation based on plaintiff's confinement in the RHU, his separation from Inmate Wisniewski, and his eventual transfer to another institution.  Defendants contend that even if plaintiff were to meet all three Rauser prongs, his claim would still fail because they had a legitimate penological interest for disciplining plaintiff by confining him to the RHU, separating him from Inmate Wisniewski, and transferring him to another institution.  (Doc. 95, at 40-41.) Defendants cite to their interest in maintaining order and security and in preventing the unauthorized group activity that was revealed to defendants through the filing of ten identical grievances.  The Third Circuit has repeatedly held that protecting "the safety and stability of

---

[3]Significantly, even if plaintiff had overcome the personal involvement hurdle, his retaliation claim would still fail.  There is undisputed evidence of record that the defendants would have made the same decision concerning the April 6, 2011 cell search, property confiscation, and subsequent discipline of plaintiff, absent any protected conduct, for reasons reasonably related to, and in furtherance, of the legitimate penological interest of maintaining order and security within the prison system by preventing inmates from engaging in unauthorized group activities.   (See Statement of Material Facts for Counts IV and V, *supra*; Doc. 95, at 37-38.)

the institution" is a legitimate penological interest, see, e.g., Davis v. Pennsylvania, 244 F.

App'x 445, 447 (3d Cir. 2007), and that unauthorized group activity by inmates constitutes a

significant threat to institutional safety and stability,  see e.g., Cooper v. Tard, 855 F.2d 125,

129 (3d Cir. 1988) (stating that preventing inmates from creating "a leadership structure

within the prison alternative to that provided by the lawful authorities" was a legitimate

penological interest); The Holy Name Society v. Horn, No. 97-804, 2001 WL 959408, at *9

(E.D.Pa. Aug.21, 2001) (noting the "inherent security problems of large inmate gatherings").

Accordingly, searching out and punishing unauthorized group activity serves a legitimate

penological interest.  It is not this court's function to second-guess the rational decision of

prison officials that Buehl's transfer to administrative custody, his separation from Inmate

Wisniewski, and his eventual transfer served the legitimate penological interest of

maintaining safety and security within the institution.  See Ebersole v. Pennsylvania, No.

01-1924, 2007 WL 2815730, at *7 (M.D. Pa. Sept. 25, 2007) (finding that the decision of

prison officials that the plaintiff presented "a legitimate risk of fraternization between

inmates and staff" would not be overturned); see also The Holy Name Society, 2001 WL

959408, at *7 (noting that "courts are ill equipped to deal with the increasingly urgent

problems of prison administration").

2.    Free Speech

a.    *Count VIII*

In Count VIII, plaintiff seeks relief on the grounds that defendants Fisher, Hollibaugh, Myers, and Painter violated his right to free speech.  An inmate's First Amendment rights are limited and may be curtailed depending upon the prison's legitimate penological objectives. See Newman v. Beard, 617 F.3d 775, 781 (3d Cir. 2010) (finding that "it is settled law that an inmate 'retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' ") (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)).  "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1978).  Since the Turner decision, the Supreme Court has consistently applied the Turner standard to prisoners' constitutional rights claims.  See Shaw v. Murphy, 532 U.S. 223 (2001) (considering a ban on inmate-to-inmate correspondence that contained legal advice); Washington v. Harper, 494 U.S. 210 (1990) (applying Turner to a substantive due process challenge to the involuntary administration of psychotropic drugs to a prisoner who had a serious mental illness); O'Lone v. Shabazz, 482 U.S. 342  (1987), (upholding the constitutionality on First Amendment grounds of a prison policy that prevented Muslim inmates from attending a weekly congregational service).

Plaintiff's free speech claim survived defendants' motion to dismiss "[b]ased on the argument set forth in Buehl's sur reply, that "[d]efendants had no legitimate penological

reason to punish Mr. Buehl for communicating with other prisoners regarding the yard/block out change. <u>See</u> Am. Compl. ¶¶ 128–202 . . . " (Doc. 76, at 19.)  Defendants come forward with the argument that the discipline of plaintiff was related to a legitimate penological purpose.  Specifically, they cite to the prohibition on petitions and limitations on engaging in group activity and reference the following factors that contributed to the decision they made in disciplining and transferring plaintiff: "a. SCI Smithfield regularly has more than 1,125 inmates housed at the facility.  Exhibit 3 ¶11.  b. With a shift complement of 75 to 100 officers per shift, the inmates vastly out-number the corrections officers.  Exhibit 3 ¶11. c. The Department forbids unauthorized group activities by inmates as a security issue.  Exhibit 3 ¶11.  d. Such activities can lead to groups of inmates banding together disobeying orders of the corrections officers, defying the Institution's rules and regulations, and could lead to inmates taking over control of the institution and placing the community outside the institution at risk. Exhibit 3 ¶11.  e. Smaller unauthorized groups of inmates can prey on other inmates, forcing these inmates to turn over commissary items; file false complaints against other inmates and staff; and create situations where inmates attempt to control other inmates physically and emotionally. Exhibit 3 ¶11." (Doc. 93, ¶ 80.)  Based on the foregoing, it is clear that the policy that led to the discipline and transfer of plaintiff is reasonably related to legitimate penological interests.  Although plaintiff disputes defendants' reliance on the policy, he does not dispute that the policy was reasonably related to legitimate penological interests.  Defendants' motion for summary judgment will be granted on plaintiff's First Amendment claim contained in Count VIII.

34

**IV.**     **Conclusion**

Based on the foregoing, defendants' motion (Doc. 92) for summary judgment will be granted.

An appropriate order follows:


                                                 **BY THE COURT:**


                                                 <u>**s/James M. Munley**</u>
                                                 **JUDGE JAMES M. MUNLEY**
                                                 **United States District Court**

Dated: April 2, 2014